## THE CONTINENTAL.

1. Although one vessel may be sailing at night with lights other than those whose use is made obligatory on her by acts of Congress, and may by actually misleading another vessel tend to cause a collision, yet this will not discharge the other vessel if she, on her part, have suffered herself to be misled by the wrong lights when, if she had been intelligently vigilant, other indications would have pointed out or led her to suspect that the vessel was not what her lights indicated.

2. Accordingly, where one vessel was using wrong lights, and the other was not thus intelligently vigilant, the two vessels were made to divide equally a loss by collision between them.

AN act of Congress—that of July 25th, 1866*—prescribes
that all coasting steamers and those navigating *bays, lakes,
or other inland waters,* shall carry a green light on the starboard side, a red light on the port side, and in addition
thereto *a central range of two white lights, the after light being
carried at an elevation of at least fifteen feet above the light at the
head of the vessel;* the head-light to be so constructed as to
show a good light through twenty points of the compass,
namely, from right ahead to two points abaft the beam on
either side of the vessel; *and the after light to show all around.*
It also enacts that *ocean-going steamers* shall carry " at the
foremast-head a bright white light," on the starboard side a
green light, and on the port side a red light; these two last
so fixed as to throw the light from right ahead to two points
abaft the beam, and fitted with in-board screens projecting
three feet, so as to prevent these lights being seen across
the bow.

A previous act, the well-known one of April 29th, 1864,
" for preventing collision on the waters,"† thus prescribes:

---

* 14 Stat. at Large, 228.                    † 13 Id 58.

ARTICLE 5. Sailing ships under way . . . shall carry the same lights as steamships under way, *with the exception of the white masthead lights, which they shall never carry.*

ARTICLE 13. If two ships under steam are meeting end on, so as to involve risk of collision, the helm of both shall be put to port so that each may pass on the port side of each other.

ARTICLE 15. If two ships, one of which is a sailing ship and the other a steamship, are proceeding in such directions as to involve risk of collision, the steamship shall keep out of the way of the sailing ship.

ARTICLE 16. Every steamship, when approaching another ship, so as to involve risk of collision, shall slacken her speed, or, if necessary, stop and reverse.

These two statutes being in force, the steam propeller North Hampton and the side-wheel steamboat Continental, two vessels of rival lines, were in the habit of making regular daily trips between New York and New Haven, on the Long Island Sound; the North Hampton leaving New York about 6 P.M. on one day, and the Continental leaving New Haven about midnight on the same day.

On the night of the 23d of October, 1868, the rival vessels were making their customary trips. That night, though cloudy and with occasional spits of rain, was not very dark nor windy. The sea was open and comparatively smooth. About midnight, the wind being north-northeast, the North Hampton approached New Haven, and by the captain's order steered straight east-northeast for the New Haven light-house; a right course apparently for her to steer when about to enter the harbor. She soon saw the lights of a steamer, which she inferred, and rightly, was the Continental coming down and out of the harbor. After the Continental came down the harbor, she changed her course to go down the Sound towards New York. "When she first changed her course," said the captain of the North Hampton, who was examined as a witness, "she headed directly for the North Hampton, which," said he, "I could tell by her range of lights, they being exactly in range after she got her course." He continued:

"After a little her course varied, a little southerly. She was then, when she hauled up, on her course westerly, distant about three miles. I continued going our course east-northeast until I was distant from the Continental, I should judge, about three-quarters of a mile. She was then bearing a very little on our port bow, nearly ahead. I then gave one blast of the whistle and changed my course one point easterly to east by north. I received no response to that whistle for, I should say, nearly or quite a minute. I then heard two blasts of the Continental's whistle, which I immediately answered by one whistle, rung two bells to stop the boat, and in the meantime told the pilot to heave the wheel hard aport."

Notwithstanding this the two steamers came violently together, the Continental striking the North Hampton on her port side a little abaft midships, nearly square on, and running through her in such a way that she went down in half an hour; her passengers just escaping with their lives.

The defence set up by the Continental for this collision was, the fact that the North Hampton had had no "central range of two white lights;" for want of which, as the Continental alleged, she took the steamer for a sailing vessel, and starboarded her helm instead of porting it. On the subject of the North Hampton's lights generally, one of the boat's hands of that vessel who had been at the wheel prior to the collision, and left it when he saw the steamer coming down the Sound, testified thus:

"I found the bow light burning brightly. The side lights were also burning brightly. The stern light I found burning dim. There were two lanterns in one box. They showed as one light. I went aft and lowered it down. After I got the box down, I went into the door where the space is, out of the draft, so they would not blow out, and when there picked up the wicks of both lights, one after another. After that was done, I took them to the staff and put them in the box and hoisted them up. I heard the North Hampton blow one whistle. I was aft then, at the time of this first whistle, was just stepping inside the passage-way with the lights, as near as I can recollect. After an interval there was a reply with two whistles from the Continental. I was then coming out of the passage-

way, as near as I can remember. The North Hampton blew one whistle again, directly after. I was then in the act of hoisting the lights at that time. After hoisting up the lights I saw the Continental coming for us, and I ran forward on starboard side. I got part of the way forward, when the vessels came together and the concussion knocked me down."

It appeared from the testimony of those on board the Continental that they had, in point of fact, mistaken the North Hampton for a sailing vessel.

The lookout of the Continental—her forward deck lookout, who had no other duty than that of lookout—"not seeing the vessel itself, but seeing a green and white light"—which he judged to be then a mile or a mile and a half distant—reported, five or six minutes before the collision, "Sail off starboard bow," and was answered at the pilot-house, "Aye, aye!"

The wheelsman, who heard the lookout's report, saw also a green and white light, "but no red light then four or five minutes before the collision, as he judged, and a mile or a mile and a half off, the North Hampton's lights bearing pretty much the whole time, until it was too late to avoid the collision, about three points on the Continental's bow." *He thereupon starboarded his helm so as to keep her off.*

The captain, who had been on the line for thirty years, and who was in the pilot-house with the wheelsman, said:

"I saw the North Hampton's green and white light; she had no stern light; sometimes in a sailing vessel they come forward and stick out a white light when they get frightened; sometimes they have a light forward to overhaul the anchor-chain."

The captain added:

"A lookout reports a steamer as a steamer, and a vessel as a vessel; all he knows by is the lights; at night, he reports four lights as a steamer, and two lights as a vessel. If the vessel seen has one colored and only one bright light, he reports her as a sail vessel. That's his orders."

On board the Continental there happened to be, going

down the Sound that night, one Horton, for seven years a Hellgate pilot. He had been in the pilot-house, and saw a green and white light—the white light forward, but he saw no aft light. The vessel on which they were seemed to him, he testified, to be a sailing vessel. He said:

"I guessed she was a sailing vessel because she did not have any stern light; I could not see her hull when I first saw her. It is generally the case for a vessel coming into port to take a light forward, to get her chain and anchor ready to drop anchor. I went away from the pilot-house to the lower cabin after I saw the lights. From the time I left the pilot-house till the collision was five or six minutes. After the collision, I saw a stern light halfway up the flag-mast."

As already mentioned, the Continental was starboarded under the impression that the North Hampton was a sailing vessel, and with a view of keeping out of her way. The North Hampton being in fact a steamer, and knowing that the approaching vessel was one, ported. A collision came of course.

The owners of the North Hampton having libelled the Continental in the District Court of Connecticut, that court dismissed the libel, considering that the North Hampton was in fault; having had no stern-light, and running in direct violation of law, which required her to have a central range of two white lights. The Circuit Court affirmed this decree, and the owners of the North Hampton brought the case here.

*Messrs. C. Donohue, C. R. Ingersoll, and J. S. Beach, for the appellants:*

Assuming that the steamer could see only the bow and side-lights of the propeller, it was a fault on her part to act as if they were the lights of a sailing-vessel. A white light is prohibited to a sailing vessel under way. She is forbidden to carry any other light than the green light on her starboard side, and the red light on her port side. Sea-going steamers are required to carry the single white light with the side colored lights. Coasting and inland water steamers carry

the colored side-lights with the bow and stern white lights. The lights, therefore, which the steamer saw, were lights which a sea-going steamer must carry, but which a sailing-vessel *must never carry*. And the steamer assumed that the vessel carrying it was not the kind of vessel which the lights declared it to be, but was the kind of vessel which the lights declared it not to be. This was recklessness.

If a steamer sees a light which does not clearly indicate the character of the vessel carrying it, she has no right to jump to the conclusion that it is carried by a vessel of any particular class, and especially not of that class which is forbidden to carry such a light. It is her duty to ascertain the truth by all the cautionary means in her power. She must use all necessary vigilance to discover whether the strange light is a fixed light or not—and if fixed, whether it is on a vessel in motion or at anchor—and if on a vessel in motion, what is the course of that vessel as indicating whether she is moved by the wind or by steam. She must look for the strength of the light seen as distinguishing a regulation-light from an ordinary hand-lantern, commonly used about a vessel's deck—and watch for the sails of the vessel—her hull— the noise of her paddles, and the lights of her saloon, if a steamer—and for all the usual indications characterizing the different classes of vessels. And if this inquiry cannot be made without slackening her speed, she must slacken her speed. If not without blowing her whistle, as a signal, she must blow her whistle. She has no right to go on at all if she is in any reasonable doubt on the subject. If, without exercising all reasonable precautions, she insists upon going on, and a collision occurs, she takes the risk, and the fault is justly visited upon her. In the case of *The Gray Eagle*,* that vessel was held to be in fault because she did not, by watching the bearings of the light of another vessel coming towards her—*The Perseverance*—discover that the light was in motion, and therefore could not be upon a vessel at

---

* 9 Wallace, 505; see also Nelson *v.* Leland, 22 Howard, 48; The Louisi-ana *v.* Isaac Fisher et al., 21 Id. 1; The Birkenhead, 3 W. Robinson, 75

anchor.   And she was condemned as in fault, although the
Perseverance was carrying a light she had no right to carry.
And such is the law of negligence everywhere.   If a man
goes upon a railroad track with shut eyes and deaf ears and
is run over, it is in vain for him to complain that the whistle
was not blown.   In the present case no precaution whatever
was taken by the steamer to discover the character of the
approaching vessel.   For it was manifest to the steamer, or
should have been, that the vessel was approaching, and was
bound into New Have·, harbor.   The steamer knew that the
propeller was due at that place at that time.   The two boats
were accustomed to meet on every trip of the propeller, and
were perfectly well known to each other.   It was therefore
the steamer's duty to look out for the propeller, just when
and where the lights of this approaching vessel appeared.
But at least there was reason for a doubt, and, if so, it was
clearly her duty to settle that doubt.   But those on board
did not allow any doubt whatever to enter their mind.   They
assumed at once that it was a sailing-vessel thus coming
toward them, right in the eye of the wind, and they adhered
to that assumption stubbornly, until it resulted in disaster.

·2.  The character of the light was manifested to the steamer,
beyond any question, by its bearings.

Those bearings are given to us by the wheelsman of the
Continental as three points on the starboard bow when the
light was first seen, and they continued the same without
alteration until the collision, or until it was too late to avoid
the collision.   Now these bearings ought to have told those
navigating the steamer, that the vessel carrying those lights
was directly approaching the steamer.   Otherwise they would
have changed.

3.  And the wind, it is admitted, was north-northeast.   The
vessel with the lights, therefore, was approaching *directly in
the eye of the wind*.   And yet the captain of the Continental
swears that he supposed the North Hampton to be a sailing-
vessel all the while, and the court below tells us that he was
justified in that supposition.

Again : the wind being north-northeast, a sailing-vessel,

in order to show her green light to the steamer, must have
been on her starboard tack, and could not have lain closer to
the wind on that tack than a northwest course.   This course
would have been nearly at right angles to the steamer's
course, and, if the vessel sailing on it was first seen three
points on the steamer's starboard bow, every minute would
carry her further out of the steamer's way, and would of
course change the bearings of her lights, and the relative
distance between her lights.

4. The orders which the captain of the steamer testifies
he had given to his lookout,* and upon which the lookout
seems to have acted, on this occasion, shows him to have
had a very confused notion of the object of the regulation
lights, and indicates a habit of inattention to their particular
significance.   It is not surprising that a lookout, receiving
such orders, should report the propeller as a sail, and is cer-
tainly not to be wondered at that the officer who could give
them should adopt such a report as infallible, and shut his
eyes and ears to any further evidence on the subject.

*Messrs. E. H. Owen and T. C. Doolittle, contra:*

The North Hampton was running in open violation of
statutory requirement and of the well-settled rules of navi-
gation adopted for the purpose of preventing collisions, in
that she had no " after light."

It is probable that at no time was the after light such as
the statute requires, for it is clear that it had been a poor,
defective light for some time previous to its being taken
down.   But however this may have been, it was taken down
at the exact moment that it was specially needed to be up,
and kept down until the Continental was completely misled
by the want of it, and a collision became inevitable.

The statute, by positive requirement, makes a central
range of white lights obligatory in inland waters.   The re-
quirement applies to all vessels under steam except " ocean-
bound steamers."   And there is the greatest reason for the

---

* See *supra*, foot of p. 348.

Argument for the Continental.

requirement, for without the central range of white lights·
the true course and direction of an approaching steamer
cannot be had in narrow work. With nothing but the
colored lights, steamers may be approaching nearly end on,
and so as to involve the risk of collision, when one of them
is not visible. The colored lights are to be so constructed
as to shine from a point right ahead to two points abaft the
beam, so that one steamer approaching another on nearly a
parallel course, a very little off either hand, would only see
one colored light, and could not thereby determine how
near the two were approaching "end on." The bow light
alone would not enable the approaching steamer to deter·
mine this fact without the aid of the after light, giving
thereby a central range of two white lights. If approaching
directly end on, the two white lights will be in range, and
if not, they will be "open."

It is no excuse for the North Hampton that her stern light,
having become dim, had been temporarily removed for the
purpose of being trimmed.*

The absence of the necessary range of lights did in fact
deceive, and could not fail to deceive, those in charge of and
navigating the Continental. The North Hampton was taken
to be a sailing-vessel; she was reported as such, and the
movements made on the part of the Continental were based
upon that idea.

It is no answer to say that those navigating the Continen-
tal, *upon reflection*, might have known that the North Hamp-
ton could not have been a sailing-vessel, because a sailing-
vessel does not carry a white light forward, and because,
with that wind, a sailing-vessel could not have been heading
as she was. Although sailing-vessels are not permitted by
law to carry a white light, yet it was proved to be not un-
usual in the night, when making preparations for landing,
to have a light on the forward deck in getting lines and
chains ready. As she did not have the lights which steamers
are required to carry, the Continental was not bound to pre-

---

* Rogers *v.* St. Charles, 19 Howard, 108; Chamberlain *v* Ward, 21 Id. 548.

sume, from the mere fact that a white light was seen at her bow, that the vessel whose lights were seen was a steamer. There is no evidence that "ocean-bound steamers," which carry a white light forward, ever frequent or are ever seen navigating any part of the Sound.

The North Hampton was also in fault in not having a lookout. The fact that she had one is not asserted on the other side. This was gross negligence. She was bound by law to have one. It was necessary for her guidance. The master and pilot had other duties to perform which rendered them incompetent.* The fact that the Continental was seen by the master and pilot does not obviate the objection. If she had had a vigilant lookout, the lights of the Continental and her direction would have been more carefully reported, and the collision might have been avoided. A vigilant lookout in the night, in a thoroughfare, is an absolute and inflexible necessity. No one can tell what might have been the effect of having a vigilant lookout forward.

The North Hampton was clearly in fault for sounding one blast of her whistle, and in attempting to cross over and pass the Continental on her left or port side, thus throwing herself right across the bows of the latter vessel.

The Continental was properly navigated and was not in any respect in fault. She was pursuing her lawful and proper course on her voyage. She had all the lights required by law properly set and burning brightly. She had a competent lookout properly stationed and faithfully attending to his duty. She had a competent engineer at his post who answered all the orders from the pilot-house promptly.

Mr. Justice CLIFFORD delivered the opinion of the court.

Ships and vessels are held liable for damage occasioned by collision, either on account of the culpable neglect or complicity, direct or indirect, of their owners, or on account of the negligence, unskilfulness, or carelessness of those employed in their control and navigation. When employed in

---

* The Ottawa, 3 Wallace, 268.

navigation ships and vessels should be kept seaworthy and be well manned and equipped for the voyage, and in cases where they are not seaworthy or not well manned or equipped, and a collision ensues between such a vessel and one without fault in that respect, the owners of the vessel not seaworthy or not well manned and equipped cannot escape responsibility, if it appears that the unseaworthiness of the vessel or the want of a competent master or of a sufficient crew or of suitable tackle, sails, or other motive power, as the case may be, caused or contributed to the disaster; and as the owners of the vessel appoint the master and employ the crew, they are also held responsible for their conduct in the control and navigation of the vessel.

Controversies growing out of collisions are cognizable in the admiralty, and when prosecuted in that jurisdiction, the rules of decision are different in several respects from those which prevail even in similar controversies when prosecuted in the courts of common law. Where the collision occurs exclusively from natural causes and without any fault on the part of the owners of either vessel or those intrusted with their control and management, the maritime rule, as defined by the Federal courts is, that the loss shall rest where it falls, on the principle that no one is responsible for such a disaster when produced by causes over which human skill and prudence could exercise no control.* Admiralty courts everywhere have now adopted that rule, but it cannot be applied where both or either of the vessels are in fault—as where the vessel of the respondent is alone in fault the libellant is entitled to a decree for his damages, and the converse of the proposition is equally true, that if the vessel of the libellant is alone in fault, proof of that fact is a sufficient defence to the libel, but if both vessels are in fault, then the damages must be equally apportioned between the offending vessels. Much uncertainty often attends the inquiry by which of those rules a given controversy should be determined, and where the evidence is conflicting the issue presented is frequently one of doubt and difficulty.

---

* Union Steamship Co. v. N. Y. and Va. Steamship Co., 24 Howard, 313.

Full damages are claimed by the libellants in this case, upon the ground that the steamboat of the respondents was alone in fault, or if that theory cannot be sustained, then they contend that both steamers were in fault and that the damages should be divided. On the other hand, the respondents contend that the vessel of the libellants, the propeller, was wholly in fault, and that the decree of the Circuit Court dismissing the libel should be affirmed.

Daily trips were run by the propeller between the ports of New Haven and New York, carrying passengers and freight, and she was on her return trip from the latter port, and near the entrance to the harbor of her home-port when she was struck by the Continental, the steamboat of the respondents, on her port side, abaft her midships, and damaged to such an extent that she sunk in half an hour. Corresponding trips were run by the steamboat of the respondents between the same ports, the Continental, however, usually leaving the port of New Haven on the same day that the propeller, the North Hampton, left New York on her return trip to the port where both steamers belonged. Accustomed as they were to start on their respective trips at stated hours, each knew pretty nearly when they would meet and where they would pass each other on the route, except when one or the other was detained by stress of weather or other special circumstances, and the proofs exhibited furnish no reason to suppose that either of the steamers met with any detention during this trip. Testimony was taken on both sides and both parties having been heard, the District Court entered a decree for the respondents. Prompt appeal was taken by the libellants to the Circuit Court, but the Circuit Court affirmed the decree of the District Court, and the libellants appealed to this court.

Before the Continental came out of the lower harbor her lights were seen by those on board the propeller when the two steamers were four or five miles apart. Distant from each other as they then were, the better opinion is that they were not at that time on courses which involved any risk of collision, but the Continental, shortly after she came out of

the lower harbor, hauled up as usual on her Sound course, heading more directly towards her ultimate destination, and from that moment the course of the two steamers was such that the rules of navigation as well as the dictates of common prudence made it the duty of each to adopt proper precautions to prevent a collision. Beyond doubt they were approaching each other nearly end on, within the maritime meaning of that phrase, and under such circumstances all must admit that the rules of navigation require that " the helms of both shall be put to port, so that each may pass on the port side of the other."*

Extended argument to establish that theory of fact does not appear to be necessary, as it agrees with the first finding of the District judge and is supported by all the attending circumstances as well as by the weight of the direct testimony. Evidently the two steamers were far enough apart at that time to have adopted whatever precautions were necessary to have prevented a collision, and it is clear that if each had obeyed the rules of navigation, they would have passed each other in safety. Fault is imputed to the steamboat Continental, because she did not port her helm as required by the rules of navigation established by the act of Congress, but the respondents contend that they were deceived and misled as to the character of the approaching vessel and consequent nature of their duty by the failure of those on board of the propeller to display proper lights, as they also were required to do by the same Congressional regulations, as amended by a subsequent act.†

Evidence to that effect was given by one of the witnesses called by the libellants. He testified that he was at the wheel prior to the collision; that he saw the Continental coming down the harbor and spoke to another seaman to take his place; that the seaman spoken to did as requested; that he went and called the master and the mates; that he looked at the lights; that the bow light and both the side lights were burning brightly, but that the stern light, which

---

* 13 Stat. at Large, 60.                     † 14 Id. 228.

consisted of two lanterns and showed as one light, he found was "burning dim;" that he went aft and took down both lanterns and went forward in the passage-way on the starboard side and having picked up the wicks carried the lanterns back and put them in the box where they belonged; that he stepped forward into the passage-way to get out of the draft, so that the wind might not blow the lights out, and he further states that he heard the propeller give one whistle just as he was stepping into the passage-way with the lanterns; that he also heard two whistles from the Continental in reply just as he was returning to replace the lights in the box; that the propeller, just as he was hoisting the lanterns, again blew one whistle; that after he replaced the lights he saw the Continental approaching the propeller, when he ran forward part way and was knocked down by the concussion.

Such a disaster could not have occurred without fault on the part of one or both vessels, as they had an open sea and good weather, and the night, though cloudy, was not very dark, as fully appears from the fact that those on board the propeller saw the lights of the Continental when she was at least four miles distant.

Coasting steamers are required to carry a central range of two white lights as well as the red and green lights prescribed for ocean-going steamers, the after light to be carried at least fifteen feet above the light at the head of the vessel, and the requirement of the act of Congress in respect to it is that it shall "show all around the horizon."* Signal lights are required by the acts of Congress in order that they may be seen by an approaching vessel in season to enable those in charge of the vessel to adopt the necessary precautions to prevent a collision with the vessel whose lights are so displayed, and when it appears that they were burning so dimly as not to fulfil the purpose and object for which they are required, they cannot be regarded as constituting a compliance with the prescribed requirement.† Apply that rule to the present case and it is quite clear that the propel-

---

* 14 Stat. at Large, 228–9:    † Chamberlain v. Ward, 21 Howard, 566.

ler was in fault, and it appears that the District and Circuit Courts both came to the conclusion that she was solely in fault and denied to the libellants all claim for damages, either as owners of the propeller or as bailees of the cargo. Whether that decision is correct or not must depend upon the evidence, as it is clear that the absence of one or more of the lights required by the act of Congress will not necessarily cast upon the delinquent party the entire consequences of such a disaster. Absence of lights in a case falling within the acts of Congress renders the owners of the vessel liable for the consequences resulting from the omission, but it does not confer any right upon the other vessel to disregard or violate any rule of navigation or to neglect any reasonable or practicable precaution to avoid a collision which the circumstances afford the means and opportunity to adopt.

Steamers displaying proper signal lights are in that respect without fault, but they have other duties to perform to prevent collision besides complying with that requirement, and if they neglect to perform such other duties they will not be held blameless because they displayed proper lights as required by the act of Congress upon that subject.*

Some conflict undoubtedly exists in the testimony as to the precise manner in which the two steamers were approaching each other after the Continental came out of the harbor and hauled up upon her Sound course, but the better opinion we all think is that they were approaching each other nearly end on, or substantially in that manner, as found by the District Court. Inquiry as to what their respective courses were before that time would be useless, as the respondents do not claim that either the lookout or master of the steamboat saw the propeller or her lights before the steamboat was put upon her Sound course. Unquestionably the lights of the propeller might have been seen earlier, but it is clear that they were not, if the witnesses are to be believed.

Lookouts are required to be vigilant, and it is not doubted

---

* The Gray Eagle, 9 Wallace, 510.

if proper vigilance had been exercised in this case those on board the steamboat might have ascertained the character of the approaching vessel in season to have adopted every necessary precaution to have avoided a collision. They must have expected to meet the propeller about that time, and under the circumstances they had no right to assume with-out a closer scrutiny that the approaching vessel was a sail-vessel because she did not show a stern light. She did show a bow light, which might well have satisfied them that the vessel was not a sail-vessel, as it is more reasonable to sup-pose that the stern light of a. steamer has become dim or extinguished than that a sail vessel will show a. light not re-quired nor authorized by the prescribed regulations. ·Proper scrutiny as to the character of the approaching vessel would or should have induced greater caution on the part of the master of the Continental, and if any doubt remained after such scrutiny was made the steamboat should have slack-ened her speed or have stopped until every reasonable de-gree of uncertainty was overcome. Navigators have no right arbitrarily to assume under all circumstances that every vessel approaching which does not show both the signal lights and the central range of two white lights is a sail-vessel which is bound to keep her course, and that if she does not she may be run down and sunk.

Prior to the enactment of the sailing rules neither steam-ers nor sail vessels, except on the lakes, were required to carry lights of any kind, and ·yet the rules of navigation were substantially the same as those prescribed in the exist-ing acts of Congress. Lights are now required, but the omission of one vessel to comply with the requirement will not excuse the other from the exercise of all due and reason-able care to prevent a collision.*

Viewed in the light of these suggestions, as the case must be, the court is fully satisfied that those in charge of the steamboat did not exercise due care and vigilance to ascer-tain the character of the approaching vessel, and that if

---

* 13 Stat. at Large, 58; 9 Id. 382; 14 Id. 228; Steamship Company v. Rumball, 21 Howard, 384

they had done so they would have been enabled to have adopted reasonable precautions to have prevented the collision.     Consequently the court is of the opinion that both vessels were in fault, and that the damages should be equally apportioned between the offending vessels.*

Where two steamers are approaching each other in an open sea on a night when the lights of a vessel may be seen five miles, the defence that one of the steamers mistook the other for a sail-vessel cannot be admitted as valid, unless it is established by full proof; and where, as in this case, it appears that the approaching steamer showed a bow light in addition to the red and green lights, the court will be still less inclined to give credence to the theory as a valid defence.

DECREE REVERSED, and the cause remanded for further proceedings in conformity to the opinion of this court.

---

* Catharine v. Dickinson, 17 Howard, 170 ; 1 Parsons on Shipping, 527; The Morning Light, 2 Wallace, 557.