Emory A. Chase et al., Appellants, v. William Belden, Respondent.

The character of an American vessel is to be determined by reference to the United States statute upon the subject and the ship's papers.

In an action against the owner of the steam yacht "Yosemite," to recover damages for alleged negligence in colliding with and sinking plaintiff's steamboat, it appeared that the "Yosemite" was described in her license as a yacht "used and employed exclusively as a pleasure vessel and designed as a model of naval architecture." By the United

States statutes (§ 2, chap. 141, U. S. Laws of 1848) the secretary of the treasury was authorized to cause such yachts, if entitled to be enrolled as American vessels, to be licensed "to proceed from port to port of the United States without entering or clearing at the custom house," or exclusively as coasting vessels. By an amendment of said statute (§ 2, chap. 170, U. S. Laws of 1870 ; U. S. R. S., § 4214) the words "and by sea to foreign ports" were added. The "Yosemite" was, at the time of the injury complained of, enrolled at the port of New York. Her certificate of enrollment recited that it was given in conformity to the title of the United States Revised Statutes, which relates exclusively to coasting and fishing vessels. Her license was a coasting license, with the added privilege of going by sea to foreign ports. The "Yosemite," at the time of the injury complained of, was proceeding up the Hudson river under steam. She carried the lights prescribed for ocean-going steamers and steamers carrying sail (U. S. R. S. § 4233, rule 3), but did not carry the "central range of two white lights" prescribed for coasting vessels navigating inland waters (Rule 7). *Held*, that the "Yosemite" was, at the time of the accident, navigating under her license in the character of a coasting vessel ; that she was in fault in not carrying the lights prescribed for such vessels, and that the trial court erred in nonsuiting plaintiff.

*It seems*, if the collision had happened upon the high seas, another question would have been presented.

(Argued November 29, 1886; decided January 18, 1887.)

APPEAL from judgment of the General Term of the Supreme Court, in the third judicial department, entered upon an order made September 10, 1885, which affirmed a judgment in favor of defendant, entered upon an order nonsuiting plaintiffs on trial.

This action was originally brought by William Donahue, the testator of the present plaintiffs, to recover the value of the steamboat "Charlotte Vanderbilt," from William Belden, the respondent, owner of the steam yacht "Yosemite," for the running down of the "Vanderbilt" by the "Yosemite," near Esopus Meadow light-house, on the Hudson river, at between nine and ten o'clock in the evening of July 14, 1882.

The value of the "Vanderbilt" was admitted to be $16,000, and that she was a total loss. The "Vanderbilt" was a freight and passenger steamboat, running between Albany and New

York, on the Hudson River, and at the time of the collision
was on her way to the city of New York. The " Yosemite "
was an iron, steam, pleasure yacht of 481 tons burden, with
two masts and having sails, which were furled at the time of
the collision. When the collision happened she was under
steam, on a trip from New York to Catskill, and proceeding
at the rate of about sixteen miles an hour. She carried the
usual red and green lights and at her foremast a white light,
corresponding in character and position with the lights pre-
scribed for ocean-going steamers and steamers carrying sail by
section 4233, rule 3 of the Revised Statutes of the United States.
She was enrolled in conformity with title 50, entitled " Regu-
lation of Vessels in Domestic Commerce " of the Revised
Statutes of the United States, and was licensed in pursuance
of chapter 2, title 48 of the same statutes, " exclusively as a
pleasure vessel and designed as a model of naval architecture,"
with leave " to proceed from port to port of the United
States and by sea to foreign ports, without entering or clear-
ing at the custom house, but not to be allowed to transport
merchandise or any passengers for pay."

There was a great mass of evidence in respect to the circum-
stances of the collision, on the part of the plaintiffs, for the
purpose of showing that the collision was caused by the neg-
ligence of the Yosemite, and especially from her failure to
carry the proper lights, and on the part of the defendant to
show that it was caused by the mismanagement and neglect of
the " Vanderbilt."

The court, at the conclusion of the case, nonsuited the
plaintiffs on the ground that no negligence had been shown
on the part of the defendant, and especially that the principal
ground of negligence on the part of the defendant, relied
upon by the plaintiffs, viz., that the " Yosemite " did not carry
the proper lights was not true, the court holding that she did
carry, at the time, the lights required.

As the case turns upon the question of lights, it is only
necessary, in addition to the foregoing facts, to state the rules
as to lights upon steam vessels, prescribed by section 4233 of

the Revised Statutes of the United States, so far as material here :

" Rule 1. Every steam vessel which is under sail, and not under steam, shall be considered a sail vessel ; and every steam vessel which is under steam, whether under sail or not, shall be considered a steam vessel.

" Rule 2. The lights mentioned in the following rules, and no others, shall be carried in all weathers between sunset and sunrise.

" Rule 3. All ocean-going steamers and steamers carrying sail shall, when under-way, carry :

" (a) At the foremast head a bright white light, of such a character as to be visible on a dark night, with a clear atmosphere, at a distance of at least five miles, and so constructed as to show a uniform and unbroken light over an arc of the horizon of twenty points of the compass, and so fixed as to throw the light ten points on each side of the vessel, namely, from right ahead to two points abaft the beam on either side.

" (b) On the starboard side a green light, of such a character as to be visible on a dark night, with a clear atmosphere, at a distance of at least two miles, and so constructed as to show a uniform and unbroken light over an arc of the horizon of ten points of the compass, and so fixed as to throw the light from right ahead to two points abaft the beam on the starboard side.

" (c) On the port side a red light, of such a character as to be visible on a dark night, with a clear atmosphere, at a distance of at least two miles, and so constructed as to show a uniform and unbroken light over an arc of the horizon of ten points of the compass, and so fixed as to throw the light from right ahead to two points abaft the beam on the port side.

" The green and red lights shall be fitted with inboard screens, projecting at least three feet forward from the lights, so as to prevent them from being seen across the bow.

" Rule 4. Steam vessels, when towing other vessels, shall carry two bright white mast-head lights vertically, in addition to their side lights, so as to distinguish them from other steam vessels. Each of these mast-head lights shall be of the

same character and construction as the mast-head lights prescribed by rule 3.

"Rule 5. All steam vessels, other than ocean-going steamers and steamers carrying sail, shall, when under way, carry on the starboard and port sides lights of the same character and construction, and in the same position, as are prescribed for side lights by rule 3, except in the case provided in rule 6.

"Rule 6. River steamers, navigating waters flowing into the gulf of Mexico, and their tributaries, shall carry the following lights, namely : One red light on the outboard side of the port smoke-pipe, and one green light on the outboard side of the starboard smoke-pipe. Such lights shall show both forward and abeam on their respective sides.

"Rule 7. All coasting steam vessels, and steam vessels other than ferry-boats and vessels otherwise expressly provided for, navigating the bays, lakes, rivers or other inland waters of the United States, except those mentioned in rule 6, shall carry the red and green lights, as prescribed for ocean-going steamers ; and, in addition thereto, a central range of two white lights ; the after-light being carried at an elevation of at least fifteen feet above the light at the head of the vessel. The head-light shall be so constructed as to show a good light through twenty points of the compass, namely, from right ahead to two points abaft the beam on either side of the vessel; and the after light so as to show all around the horizon. The lights for ferry boats shall be regulated by such rules as the board of supervising inspectors of steam vessels shall prescribe."

*P. Cantine* for appellants. The want of proper lights, lookout, licensed pilot, or any of the things required by law, may be repelled and the question of facts submitted to the jury, whether the collision was the result of other causes for which the parties were negligent. It raises a presumption of negligence which can be overcome. (*Blanchard* v. *N. J. Steamboat Co.*, 59 N. Y. 292; *Cooper* v. *East. Trans. Co.*, 75 id. 116 ; 68 id. 392, 395 ; *Lambert* v. *S. I. R. R. Co.*, 70 id. 109 ; The Atlas, 4 Benedict, 27 ; 2 Moore's Priv. C. R. [N. S.];

The Constitution, 453 ; *The Roona & Ava*, 2 Asp. Mar. L. Cas. 182 ; *The Cayuga*, 14 Wall. 270 ; *The Sunnyside*, 1 Otto, 208 ; *Allan* v. *Flora*, Holt, 114 ; *The Jane Bacon*, 27 W. R. 35 ; *The Legatees and the Emily*, Holt, 217 ; *Handayside* v. *Wilson*, 3 Car. & P. 528 ; *The Ida* v. *The Wasa*, 2 Mar. L. Cas. [O. S.] 414.) The yacht should not only have slowed but should have reversed or backed in time to avoid the collision. (*The Beryl*, L. R. 9 P. D. 137 ; *The Khedive*, L. R. 5 App. Cas. 876 ; *The Berkenhead*, 3 W. Rob. 75 ; *The James Watt*, 2 id. 270 ; *The Vivid*, 7 Notes of Cas. 127.) When signals are to be given, or any precautions taken, it must be done in time to enable the parties to act and accomplish the results required. If not given in time, the party is not relieved even by giving the proper signal or doing the proper act. (*The Beryl*, L. R. 9 P. D. 137, 140 ; *The Milwaukee*, Brown Adm. 313 ; *The Khedive*, 5 App. Cas. 876, 905 ; *The Wenona*, 19 Wall. 41, 52 ; *The Dexter*, 23 id. 69 ; *The Benares*, L. R., P. D. 16.) It was a question for the jury to determine if the speed of the yacht was not excessive under the circumstances. (*Rogers* v. *Steamer St. Charles*, 19 How. [U. S.] 108 ; Law of Coll. at Sea, Marsd. [2d ed.] 351, 358.) When approaching danger both vessels should stop. (*The Grand Republic*, 16 Fed. R. 425 ; *The City of N. Y.*, 15 id. 624 ; *Studwell* v. *E. H. Coffin*, 8 Rep. 297 ; *The Johnson*, 9 Wall. 146.) Each vessel is bound to use all reasonable skill to avoid collision without regard to the previous fault of the other vessel. (*The Warren*, 18 Fed. R. 559.) The State statute and custom on the Hudson river required the yacht to carry the central range light. The State court will enforce it even if the Federal courts would not. (*The New York* v. *The Sarah Johanna*, 18 How. [U. S.] 223 ; *The Tyenvord Swab* Adm., 374.) Where there was no lookout, it was a question for the jury to determine if the absence of a lookout was the cause of the collision (*Blanchard* v. *N. J. Steamboat Co.*, 59 N. Y. 292, 295, 296 ; *The Annie Lindsley*, 104 U. S. 185 ; *The Dexter*, 23 Wall. 69 ; *The Fannie*, 11 id. 238 ; *The America*, 2 Otto [U. S.], 436.)

*Luther R. Marsh* and *William G. Wilson* for respondent.
The management of the "Vanderbilt" was in violation of
the "Sailing and Steering Rules." (U. S. R. S. tit. 48, p.
823, § 4233; id. 858, §§ 4405, 4412; Gray on Reg. for Prev.
Coll. at Sea, 3.)   The "Vanderbilt" was chargeable with neg-
ligence, on the uncontradicted proof, in that she had no look-
out at the time of the collision, in the proper sense of the
word. (*The Ant.* 10 Fed. R. 294, 297; *St. John* v. *Paine*,
10 How. 558; *Newton* v. *Stebbins*, id. 607; *The Genesee
Chief*, 12 id. 462; *The Catherine*, 17 How. 177; *Chamberlain*
v. *Ward*, 21 id. 548; *Haney* v. *Steam Packet Co.*, 23 id. 293;
*The Ottawa*, 3 Wall, 268.)

ANDREWS, J.   The plaintiffs were nonsuited on the ground
that the "Yosemite" at the time of the collision, carried the
proper lights, and that no other negligence was imputable to
her.   This ruling was affirmed by the General Term.

The right of the defendant to maintain this judgment must,
we think, turn upon the correctness of the ruling that the
"Yosemite" was free from negligence.   The counsel for the
defendant while strenuously maintaining that the "Yosemite"
had the proper lights, also insists that if the court below erred
in this respect, nevertheless, the nonsuit should be affirmed
on the ground that the collision did not result from this
omission of duty, but was solely attributable to the mis-
management of the "Vanderbilt."   The question whether
there was any negligence on the part of the "Vanderbilt,"
which would bar a recovery, was not considered or decided on
the trial.   The nonsuit was put exclusively upon the absence
of negligence on the part of the "Yosemite," and was affirmed
on that ground by the General Term.   If the ruling on the
question of lights was erroneous, the case should, we think,
be sent back for a new trial, on which the question as to the
negligence of the "Vanderbilt" can be presented and
considered.

The question whether the "Yosemite" at the time of the
collision carried the proper lights, depends upon the construc-

tion of the rules for preventing collisions on water, prescribed in Tit. 48, Chap. 5 of the Revised Statutes of the United States, as applied to the "Yosemite" while navigating the Hudson river. The rules prescribing the lights to be carried by steam vessels, divide such vessels into three classes, *first*, "ocean-going steamers, and steamers carrying sail," embraced in rule three; *second*, "river steamers navigating waters flowing into the Gulf of Mexico, and their tributaries," embraced in rule six; and *third*, "all coasting steam vessels and steam vessels other than ferry boats and vessels otherwise expressly provided for, navigating the bays, lakes, rivers, or other inland waters of the United States, except those mentioned in rule six," embraced in rule seven. In addition, rule four prescribes the lights to be carried by steam vessels when towing other vessels, which appears to be of general application. The "Yosemite" at the time of the collision had a green light on her starboard side, a red light on her port side, and at the foremast head a white light, being the lights prescribed for "ocean-going steamers and steamers carrying sail." It is insisted on the part of the defendant that the "Yosemite" was "an ocean-going steamer and a steamer carrying sail," and was bound to carry the lights prescribed in rule three, whether navigating the ocean or inland waters. The counsel for the plaintiffs, however, denies that the "Yosemite" was at the time of the collision, "an ocean-going steamer and a steamer carrying sail," within the meaning of rule three, and insists that the words "ocean-going steamer and a steamer carrying sail," are descriptive only of steamers while traversing the ocean and when on the high seas, and that every steamer. except those mentioned in rule six, while navigating inland waters, is bound to carry a "central range of two white lights," as prescribed in rule seven, whatever may be its general character as an ocean or inland vessel. We deem it unnecessary to decide this general question.

The "Yosemite" was, we think, in legal character and by proper nomenclature a "coasting steam vessel," and was, therefore, within the express terms of rule seven, bound to carry the

central range lights prescribed in that rule. Even if this may not be absolutely true of the "Yosemite" in all situations, it was, nevertheless, true of her when navigating inland waters. If the "Yosemite" was a coasting vessel, it becomes quite unimportant to determine the true construction of the limiting clauses in rule seven. The rule in express words applies to "all coasting steam vessels," and plainly no vessels of that character are by the subsequent language excepted from the obligation to carry the central range lights. The legal character of a vessel is to be determined by reference to the statute and the ship's papers. The "Yosemite" was a yacht "used and employed exclusively as a pleasure vessel and designed as a model of naval architecture," and is so described in her license. By section 2, chapter 141, of the United States statutes of 1848, the secretary of the treasury was authorized to cause yachts "used and employed exclusively as pleasure vessels, and designed as models of naval architecture," if entitled to be enrolled as American vessels, to be licensed "to proceed from port to port of the United States without entering or clearing at the custom house." This statute was amended by section 2, chapter 170 of the United Statute of 1870, by inserting after the words "United States," the words "and by sea to foreign ports," and the original statute as amended by the act of 1870, now stands as section 4214 of the Revised Statutes. It will be observed that under the statute of 1848 yachts licensed thereunder were exclusively coasting vessels. By the amendment they might have a double character, viz., that of coasting vessels, and vessels entitled to go upon the seas to foreign ports. The "Yosemite" at the time of the collision, was enrolled at the port of New York, and her certificate of enrollment recites that it was given in conformity to title 50 of the United States Revised Statutes entitled "Regulations of Vessels in Domestic Commerce." She was also licensed, and her license recites that it was granted in pursuance of chapter 2, title 48, entitled "Regulations of Commerce and Navigation." By reference to title 50 of the United States

Revised Statutes, under which the "Yosemite" was enrolled, it will be found that it relates exclusively to coasting and fishing vessels. The title next preceding, viz., title 49, is entitled "Regulations of Vessels in Foreign Commerce." It thus appears that the "Yosemite" was enrolled under the statute relating to coasting vessels, and her license was a coasting license, with the added privilege of going by sea to foreign ports. It does not seem to admit of reasonable doubt, having reference to the statute and to the enrollment and license, that the "Yosemite" while navigating the Hudson river, was navigating under her license in the character of a coasting vessel. This brought her within the opera·· tion of rule seven, and she was, therefore, in fault in not carrying the lights prescribed by that rule. If the collision had happened on the high seas, another question would be presented. In the case of the "Glaucus," which came before LOWELL, J., in the United States District Court, Massachusetts, referred to in a note in Parsons on Shipping and Admiralty (vol. 1, p. 562), which arose under the act of 1866 (U. S. Stats. at Large, vol. 14, chap. 234, § 11), of which section 4233 of the Revised Statutes is in substance a re-enactment, it appeared that the "Glaucus," a steamer bound from New York to Boston, came into collision with a sailing vessel on Long Island Sound. The steamer had, in addition to her two side lights, two white lights, one at her bow and one at her masthead. It was contended that she should have had only one white light. LOWELL, J., speaking of the act of 1866 said: "Its language does not seem to be very happily chosen. It puts ocean steamers and steamers carrying sail in one class, with one sort of light, and coasting steamers in another, with a different sort, whereas most of the coasting steamers on the Atlantic coast are both ocean-going and carrying sail, so that it may sometimes be difficult for the persons concerned to know to which order they belong." (See "*The Continental*," 14 Wall. 345.) It is decisive there that the "Yosemite" at the time of the collision was navigating inland

waters under a coasting license, and that by the explicit language of rule seven, she was bound to carry the central range lights.

The judgment should be reversed, and a new trial granted. All concur.

Judgment reversed.