**UNITED STATES v. FARR SUGAR CORP. et al.**

**No. 252, Docket 21990.**

United States Court of Appeals Second Circuit.

Argued May 7, 1951.

Decided Aug. 31, 1951.

Leonard J. Matteson, of New York City (Bigham, Englar, Jones & Houston, Oscar R. Houston and Richard F. Shaw, all of New York City, on the brief), for appellants Farr Sugar Corporation and American Spirits Inc.

Roscoe H. Hupper, of New York City (Irving H. Saypol, U. S. Atty., Burlingham, Veeder, Clark & Hupper, and Benjamin E. Haller, all of New York City, on the brief), for the United States, appellee.

Cletus Keating, of New York City (Kirlin, Campbell & Keating, Edwin S. Murphy, and Louis Gusmano, all of New York City, on the brief), for Belgian Overseas Transport, S. A., claimant-libellant.

Before SWAN, AUGUSTUS N. HAND, and CLARK, Circuit Judges.

CLARK, Circuit Judge.

This appeal presents only a single legal issue, but a vastly important one in its effect on seagoing commerce and the carriage of goods by ships. It is the validity of the "Both-to-Blame" collision clause now commonly inserted in ocean carriers' bills of lading. As is now well known, federal legislation has relieved shipping of the ancient insurer's liability toward cargo and even of its responsibility for negligent navigation; but Supreme Court decisions have held that cargo may recover in full against a non-carrying ship negligently in collision

with its carrier, and that the non-carrier may recover in part, under the rule of divided damages, from the also negligent carrier. To correct this asserted "anomaly" the shipowners devised the clause in question, which requires the cargo to return to its carrier the amounts thus "received indirectly." Cargo owners maintain that such a provision violates both the long-standing admiralty and common-law prohibitions against carrier limitations of liability and also specific prohibitions of the federal statutes; while shipowners contend that the clause is in aid of the public policy expressed in the legislation, and merely corrects a manifest paradox.

Such is the background of this case, which arose specifically when the S. S. Nathaniel Bacon, owned by the United States, collided in New York Harbor on November 24, 1942, with the M. V. Esso Belgium, owned by Belgian Overseas Transport, S. A. Both the vessels and the cargo, which was aboard the "Nathaniel Bacon," thereby sustained damage. After the shipowners instituted libels, cargo owners were impleaded in one; and, in the other, insurance companies which had paid for the cargo losses intervened. The parties have stipulated that both vessels were at fault, and that the damage should be divided here one-third against the United States as owner of the "Nathaniel Bacon" and two-thirds against the "Esso Belgium's" owner. The libels were consolidated and the only matter remaining in dispute, before the entry of an interlocutory decree, was the claim for indemnity made by the United States against the cargo owners under the "Both-to-Blame" clause in the bills of lading.[1] The district court held the clause valid, 90 F.Supp. 836, and its interlocutory decree was therefore framed to provide for ultimate indemnity to the United States of any amounts decreed in favor of cargo owners from the "Esso Belgium" and in turn recovered by the latter from the United States. From this decree the cargo owners have appealed.

Quite probably a court has no more delicate problem placed before it than that of deciding whether to fill in an asserted gap in remedial legislation. Surely a court is under some obligation to see that hard-won reforms are workable as the legislature has intended, or, perhaps, would have intended had the specific problem been foreseen. On the other hand, since so much of legislative change is a product of compromise, of the ameliorative and abrasive effects of various pressures, care must be taken lest what is lost in the legislative halls be granted by courts in the guise of "interpretation." No general guide can

---

[1] Paragraph 9 of the bills of lading is as follows:

"If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-carrying ship or her owners to the owners of said goods and set-off, recouped or recovered by the other or non-carrying ship or her owners as part of their claim against the carrying ship or Carrier.

"The foregoing provisions shall also apply where the owners, operators or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect of a collision or contact."

This is the form of the "Both-to-Blame" clause which has been in use in the North Atlantic Freight Conference since Sept. 1, 1937. Robinson, Admiralty 872, 873, 1939; Knauth, Ocean Bills of Lading 95, 136, 175, 3d Ed. 1947. An earlier form in use before the passage of the Carriage of Goods by Sea Act in 1936, 46 U.S.C.A. § 1300 et seq. (see Knauth, op. cit. supra, at 254) was upheld in The W. W. Bruce, D.C.E.D.N.Y., 14 F.Supp. 894; but on appeal the court found that seaworthiness of the vessel in all respects had not been proven, thus rendering it unnecessary to consider "the much debated legal question as to the validity of the both-to-blame collision clause." 2 Cir., 94 F.2d 834, 837, certiorari denied Pacific-Atlantic S. S. Co. v. Weyerhaeuser Timber Co., 304 U.S. 567, 58 S.Ct. 950, 82 L.Ed. 1533.

be stated; it is always a question of how much and how far. Here Judge Medina in the court below was persuaded that an undesired gap existed and ought to be closed—or rather that the shipowners should not be forbidden to close it. There is no doubt that he has stated a persuasive case demonstrating how, under existing law in the absence of the clause, the shippers may recover 100 per cent of their loss when they can trace it back to two negligent navigators rather than simply to one; and he finds a useful analogy in the accepted validity of the "Jason clause" with respect to general average, hereinafter discussed. The question is obviously one of difficulty and no sure answer can be expected until the Supreme Court has passed upon the matter. But on balance we think the decision goes too far; it allows the carriers to be legislators beyond present justification.

The able arguments in this case went into details as to the background and specific content of the legislative enactments. These we shall examine. But before we do so, we may state certain general conclusions. First, the correction of the "anomaly" must often be at most a rough and perhaps uncertain approximation of justice. The formal necessity of three successive suits pressed to conclusion—except as consolidation may somewhat lessen the duplication—makes for uncertainty at the outset; jurisdiction may not be freely obtainable in each instance, and the suits, for lack of legal right or perhaps inclination or determination, may stop before justice is fully assuaged. Then the non-carrier may be in a position to seek a limitation of its liability and may choose

to do so. This can lead to various strange situations where advantages and disadvantages to shipper and carrier may turn upon a third party's legal position or choice as to such limitation.[2] Moreover, the American rule of divided, rather than proportionate, damages may seem as unfair in this connection as it has in others; had the parties not stipulated in our present case, we might well have had a situation where the cargo owners found themselves cut down to half recovery, although one navigator, on the parties' own premise, was twice as negligent as the other. Of course rough justice may be better than none; on the other hand, the role of *deus ex machina* is not lightly to be assumed by one who lacks official standing for the role.

Second, the prohibition against special contracts limiting liability is one of great strength in our law and survives all but definite and clear restrictions or limitations upon it authorized by the Congress itself. This we point out in some detail below.

Third, the clause in question patently overturns settled principles of our law which have long been the subject of discussion in learned articles and treatises, in the halls of Congress, and in conferences and conventions with other countries. Two such settled principles are the particular subject of sustained and vigorous attack by the shipowners here, as their position necessarily demands; namely, the rule allowing cargo to recover *in solido* for its full damage against the negligent non-carrier, and the rule in turn allowing the non-carrier to include sums so paid cargo as part of its damage in seeking divided damages against the negligent car-

2. For example, the operation of the rule that a negligent shipowner may not share equally with an innocent cargo owner in the distribution of the limitation fund of a third party, The George W. Roby, 6 Cir., 111 F. 601, 614–621, certiorari denied Lakeland Transp. Co. v. Miller, 183 U.S. 699, 22 S.Ct. 936, 46 L.Ed. 396; Petition of Socony Vacuum Transp. Co., D.C.S.D.N.Y., 93 F.Supp. 718, 739, could mean that the cargo claims would exhaust the fund. Counsel suggest that since there is then no recoupment by the non-carrier there remains no possibility of liability for indemnity by the

cargo. Quite possibly this is so. But could it not be reasonably claimed that cargo should repay what it has prevented its carrier from recovering?

Other anomalous results depending on the non-carrier's limitation of liability will readily come to mind. Certainly that possibility is suggested by the view of the court below, D.C.S.D.N.Y., 90 F. Supp. 836, 842, as to "the realities of the situation under the division of damages rule" where "the non-carrier is in fact responsible for only 50% of the damage to cargo."

rier. These rules, it is true, were expounded by the Supreme Court rather than set by Act of Congress; but they have been well settled for more than half a century, have acquired staunch support, and have survived severe attack aimed at legislative change. The shipowners assert that the clause in question corrects an unfortunate rule peculiar to the United States; as the "Esso Belgium's" brief puts it: "The Both-to-Blame Clause accomplishes, by agreement, in the United States, a somewhat similar distribution of cargo loss which is [sic] accomplished by the Collision Convention of 1910 in practically every other maritime country of the world."[3] This appears, on its face at least, to be a powerful argument in favor of change in the American rule; but the greater the stress upon this argument, the more surely would it seem to follow that correction is for Congress rather than the courts.

One other fact requires special note. The shipowners stress the consensual nature of the clause, arguing that a bill of lading is but a contract. But that is so at most in name only; the clause, as we are told, is now in practically all bills of lading issued by steamship companies doing business to and from the United States. Obviously the individual shipper has no opportunity to repudiate the document agreed upon by the trade, even if he has actually examined it and all of its twenty-eight lengthy paragraphs, of which this clause is No. 9. This lack of equality of bargaining power has long been recognized in our law; and stipulations for unreasonable exemption of the carrier have not been allowed to stand. Liverpool & G. W. Steam Co. v. Phenix Ins. Co., 129 U.S. 397, 441, 9 S.Ct. 469, 32 L.Ed. 788; Inman v. South Carolina R. Co., 129 U.S. 128, 139, 9 S.Ct. 249, 32 L.Ed. 612; Sante Fé, P. & P. R. Co. v. Grant Bros. Const. Co., 228 U.S. 177, 184, 185, 33 S.Ct. 474, 57 L.Ed. 787. Hence so definite a relinquishment of what the law gives the cargo as is found here can hardly be found reasonable without direct authorization of law. Actually the shippers, through official bodies, appear to have registered their opposition where they could and successfully at that, *viz.*, in the halls of legislation.[4]

We now turn directly to the legislative background. Prior to the passage of the Harter Act in 1893, 46 U.S.C.A. § 190 et seq., it was said: "By the settled law, in the absence of some valid agreement to the contrary, the owner of a general ship, carrying goods for hire, whether employed in internal, in coasting, or in foreign commerce, is a common carrier, with the liability of an insurer against all losses, except

3. The Brussels Collision Convention of 1910, 6 Benedict on Admiralty 3–7, 6th Ed. 1941, was never ratified by the United States Senate, although it remained pending from its submission to the Senate in 1937 until its withdrawal by the President in 1947; and the Senate Committee on Foreign Relations, after conducting hearings in 1938, reported favorably on it in 1939. 6 Benedict, loc. cit. and 1951 Supp. 3. The Maritime Law Association seems consistently to have opposed ratification, see Doc. 310, April 1947, and Doc. 311, May 1947; and we find in the record a strong letter in opposition from John M. Woolsey to the Assistant Secretary of Commerce under date of Feb. 14, 1928.

4. Counsel suggest that shippers are actually not harmed, since they are protected by insurance, and that this is really a contest between insurance underwriters, the cargo underwriters on the one hand and the P. and I. underwriters for the shipowners on the other. We have had like intimations, without exact knowledge, in other cases, so much so that a good share of admiralty litigation might well seem only a contest among insurers; perhaps ignorance of the facts of admiralty life is a blessing in allowing federal judges to keep on working without realizing how futile their labors may be. But beyond such compulsions to continue in pursuit of justice and truth, it would seem that our problem would have more significance than some others. For (1) if ever there may be unsophisticated strays among admiralty litigants, it would seem that they must be among shippers, not all of whom will know all the rules; (2) the objective of federal legislation to provide a code of principles and to outlaw special provisions to be feared and guarded against seems a worthy one; and (3) shifting the burden of insurance costs should not be left to the control and choice of the one group which is seeking to avoid the burden.

only from such irresistible causes as the act of God and public enemics. Moll. De J.Mar. bk. 2, c. 2, § 2; 2 Bac.Abr. 'Carrier,' A; Barclay v. Cucullay Gana, 3 Doug. [K.B.] 389; 2 Kent, Comm. 598, 599; Story, Bailm. § 501; The Niagara [v. Cordes], 21 How. 7, 23 [16 L.Ed. 41, 46]; The Lady Pike (Germania Ins. Co. v. The Lady Pike), 21 Wall. 1, 14 [22 L.Ed. 499, 503]." Liverpool & G. W. Steam Co. v. Phenix Ins. Co., supra, 129 U.S. 397, 437, 9 S.Ct. 469, 470, approved in Jahn v. The Folmina, 212 U.S. 354, 361, 29 S.Ct. 363, 53 L.Ed. 546, 15 Ann.Cas. 748. See also The Delaware, 14 Wall. 579, 596, 597, 20 L.Ed. 779; The Maggie Hammond, 9 Wall. 435, 444, 19 L.Ed. 772; Clark v. Barnwell, 12 How. 272, 280, 281, 13 L.Ed. 985. The courts were not at all disposed to reduce this responsibility; case after case rings the changes on this principle in various forms.[5]

Moreover, the scope of operation of "some valid agreement to the contrary" was strictly limited. The rule was thus stated by Mr. Justice White in The Kensington, 183 U.S. 263, 268, 22 S.Ct. 102, 104, 46 L.Ed. 190: "It is settled in the courts of the United States that exemptions limiting carriers from responsibility for the negligence of themselves or their servants are both unjust and unreasonable, and will be deemed as wanting in the element of voluntary assent; and, besides, that such conditions are in conflict with public policy. This doctrine was announced so long ago, and has been so frequently reiterated,

that it is elementary. We content ourselves with referring to the cases of the Baltimore & O. S. W. R. Co. v. Voigt, 176 U.S. 498, 505, 507, 20 S.Ct. 385, 44 L.Ed. 560, 565 and Knott v. Botany Worsted Mills, 179 U.S. 69, 71, 21 S.Ct. 30, 45 L.Ed. 90, 93, where the previously adjudged cases are referred to, and the principles by them expounded are restated." So also it was said in The Jason, 225 U.S. 32, 49, 32 S. Ct. 560, 562, 56 L.Ed. 969: "Prior to the Harter act it was established that a common carrier by sea could not, by any agreement in the bill of lading, exempt himself from responding to the owner of cargo for damages arising from the negligence of the master or crew of the vessel. Liverpool & G. W. Steam Co. v. Phenix Ins. Co. (The Montana), 129 U.S. 398, 438, 9 S.Ct. 469, 32 L.Ed. 788, 791; following New York C. R. Co. v. Lockwood, 17 Wall. 357, 21 L.Ed. 627."

The Harter Act, passed in 1893, 27 Stat. 445, 46 U.S.C.A. §§ 190–195, definitively outlawed clauses or covenants of the bill of lading relieving the vessel's owners or agents from negligence in the care and delivery of cargo or from any obligation to exercise due diligence to make the ship seaworthy; it also, and most importantly, relieved the vessel of liability for losses from faults or errors in navigation or dangers of the sea in general if such diligence was exercised. The Delaware, 161 U.S. 459, 471, 472, 16 S.Ct. 516, 40 L.Ed. 771; see L. Hand, J., concurring in American Mut. Liability Ins. Co. v. Matthews, 2

---

**5.** See e. g., Santa Fé, P. & P. R. Co. v. Grant Bros. Const. Co., 228 U.S. 177, 33 S.Ct. 474, 57 L.Ed. 787; The Irrawaddy, 171 U.S. 187, 189, 190, 18 S.Ct. 831, 43 L.Ed. 130. Moreover, where goods were received aboard in good order and later damaged, it was the carrier's burden to show that the damage or loss was occasioned by one of the excepted causes, if any, contained in the bill of lading. Jahn v. The Folmina, 212 U.S. 354, 29 S.Ct. 363, 53 L.Ed. 546, 15 Ann. Cas. 748; Clark v. Barnwell, 12 How. 272, 13 L.Ed. 985. Even this was not all: the carrier had to provide a seaworthy ship, and his warranty to do so was "absolute" and did not "depend on his knowledge or ignorance, his care or negligence." The Caledonia, C.C.Mass.,

43 F. 681, 685, affirmed 157 U.S. 124, 15 S.Ct. 537, 39 L.Ed. 644, approved in The Edwin I. Morrison, 153 U.S. 199, 210, 14 S.Ct. 823, 825, 38 L.Ed. 688; Martin v. The Southwark, 191 U.S. 1, 6, 24 S.Ct. 1, 48 L.Ed. 65. He also had the burden of showing that his ship was seaworthy at the beginning of the voyage. Jahn v. The Folmina, supra, 212 U.S. at pages 361–363, 29 S.Ct. at pages 364–365; Martin v. The Southwark, supra, 191 U.S. at pages 15, 16, 24 S.Ct. at pages 5, 6; The Edwin I. Morrison, supra, 153 U.S. at page 211, 14 S.Ct. at page 826. In sum the carrier had not only a very heavy responsibility to his cargo, but also a stiff burden to show that he had discharged that responsibility.

Cir., 182 F.2d 322, 325, 326. The conditional release from liability for negligence was contained in § 3 of the Act, 46 U.S.C.A. § 192, set forth in full in the footnote.[6] The interpretation of this provision restricting the exemption to suits brought directly by or on behalf of cargo owners, made in 1899, in The Chattahoochee, 173 U.S. 540, 19 S.Ct. 491, 43 L.Ed. 801, provides the underlying legal principle which the Both-to-Blame clause is designed to overturn. We must therefore examine its development even though the controlling statute here is the Carriage of Goods by Sea Act of 1936 which was incorporated into the bills of lading. 46 U.S.C.A. § 1312. But the latter Act carries on the policy of the earlier statute, removing, however, the condition of due diligence for the exemption from liability of the carrier or ship for "act, neglect, or default of the master, mariner, pilot, or the servants of the carrier in the navigation or in the management of the ship." 46 U.S.C.A. § 1304(2)(a).[7] It also contained a prohibition against clauses lessening liability other than as provided in the Act. 46 U.S.C.A. § 1303 (8), discussed below.

It had long been settled that cargo owners could recover in full from a negligent non-carrier in collision with an equally negligent tug which was towing the cargo. The Atlas, 93 U.S. 302, 315, 23 L.Ed. 863, reversing the Circuit Court which had held on authority of The Milan, 1 Lush. 388, that recovery could be only in proportion to the total negligence—one-half the total loss under the American rule of divided damages. In his opinion Mr. Justice Clifford said: "Nothing is more clear than the right of a plaintiff, having suffered such a loss, to sue in a common law action all the wrong-doers, or any one of them, at his election; and it is equally clear, that, if he did not contribute to the disaster, he is entitled to judgment in either case for the full amount of his loss."

■ A next step is that where the owner of goods damaged in a collision involving two negligent vessels does sue the non-carrying vessel and recovers his damages, then the amount paid by the non-carrying vessel becomes part of its own "damages" when the two vessels come to assess their own liability for the collision against each other. Mr. Justice Holmes has stated the principle thus clearly in Erie R. Co. v. Erie & W. Transp. Co., 204 U.S. 220, 226, 27 S.Ct. 246, 247, 51 L.Ed. 450: "And it is established, as it logically follows, that the division of damages extends to what one of the parties pays to the owners of cargo on board the other. The Chattahoochee, 173 U.S. 540, 19 S.Ct. 491, 43 L.Ed. 801. The right to the division of the latter element does not stand on subrogation, but arises directly from the tort." See also The Cockatoo, 2 Cir., 61 F.2d 889, 891, 892, certiorari denied Howard v. Randall & McAllister, 287 U.S. 669, 53 S.Ct. 292, 77 L.Ed. 576; and compare Aktieselskabet Cuzco v. The Sucarseco, 294 U.S. 394, 404, 55 S.Ct. 467, 79 L.Ed. 942.

■ Appellants have naturally stressed the point here settled that recovery of di-

---

6. "If the owner of any vessel transporting merchandise or property to or from any port in the United States of America shall exercise due diligence to make the said vessel in all respects seaworthy and properly manned, equipped, and supplied, neither the vessel, her owner or owners, agent, or charterers, shall become or be held responsible for damage or loss resulting from faults or errors in navigation or in the management of said vessel nor shall the vessel, her owner or owners, charterers, agent, or master be held liable for losses arising from dangers of the sea or other navigable waters, acts of God, or public enemies, or the inherent defect, quality, or vice of the thing carried, or from insufficiency of package, or seizure under legal process, or for loss resulting from any act or omission of the shipper or owner of the goods, his agent or representative, or from saving or attempting to save life or property at sea, or from any deviation in rendering such service." § 3, 46 U.S.C.A. § 192.

7. The carrier continues to have a duty to exercise due diligence to make the ship seaworthy and to properly man, equip, and supply it, 46 U.S.C.A. § 1303(1); for loss proximately resulting from his failure to do so, he is held liable. Robinson, Admiralty 503, 507–513, 1939; Knauth, Ocean Bills of Lading 135, 136, 3d Ed. 1947.

vided damages is the ship's own right arising from the tort and not a recovery in the right of the cargo. But the damages suffered by the cargo do thus help to determine the amount of recovery by the non-carrier and in this way can be said to be "indirectly" recovered from the carrier. For the non-carrier's damages when ascertained are treated in accordance with the American rule that where two ships are involved in a collision, and both are at fault, the less heavily damaged ship is to pay to the other one-half the difference between the amount of damage suffered by the more heavily damaged ship and that suffered by the one less heavily damaged. This rule appears to date from The Catharine, 17 How. 170, 177, 178, 15 L.Ed. 233. It grew old early and is now thoroughly settled. The James Gray v. The John Fraser, 21 How. 184, 194, 195, 16 L.Ed. 106; The Maria Martin, 12 Wall. 31, 42, 43, 20 L.Ed. 251; The Continental, 14 Wall. 345, 361, 20 L.Ed. 801; The Sunnyside, 91 U.S. 208, 215, 23 L.Ed. 302; The America, 92 U. S. 432, 438, 23 L.Ed. 724; The Potomac, 105 U.S. 630, 631, 26 L.Ed. 1194; The North Star, 106 U.S. 17, 22, 1 S.Ct. 41, 27 L.Ed. 91. Though this court, along with others, has from time to time expressed discontent at the American refusal to follow the rule of proportionate division according to the degree of fault now general in the maritime world since the International Convention of 1910, this is obviously a matter of policy for Congress. See Robinson, Admiralty 855, 856–859, 1939.

■ The final step, settled by The Chattahoochee, supra, 173 U.S. 540, 555, 19 S.Ct. 491, 497, was that the exemption from direct responsibility of the vessel to cargo granted by the Harter Act did not prevent these successive recoveries, first by cargo against the non-carrier and second by the latter in part against the carrier. In that case the schooner Golden Rule collided with the steamship Chattahoochee and was totally lost with all her cargo. The steamship was uninjured. Libellants, acting (a) as bailees of the cargo, suing on its behalf, and (b) as owners of the schooner, then sued the steamship for all losses incurred. Both ships were found to be at fault. Holding that cargo must be paid in full, the Court then allowed the steamer to recoup from the schooner one-half of this amount so that its ultimate liability was found by deducting half the value of the cargo from half the value of the sunken schooner. The Court said explicitly that "the relations of the two colliding vessels to each other remain unaffected by this act, notwithstanding one or both of such vessels be laden with a cargo."

Whether or not this case is as definitely erroneous as the shipowners here and others have thought, it would appear to have been thoroughly considered. The arguments of counsel indicate that the views later advanced in criticism were then presented, the opinion shows care, and two justices dissented, albeit without opinion. Moreover, the reasoning of the decision is logical against the American background. Of course it does indicate that the Court was not disposed to lessen the old rigorous obligations of a common carrier without quite clear authority from Congress. The opinion relies on cases which had tended to restrict carriers' advantages and shows that the Court wished to mark a clear separation between the rule for division of damages applicable between ships and other rules which were fashioned for the carriers' benefit. In The Delaware, supra, 161 U. S. 459, 471, 472, 16 S.Ct. 516, 522, where no question of cargo was involved, a shipowner had urged that the first part of § 3 of the Harter Act absolved him from liability toward another ship for collision damage resulting from his negligent navigation. This construction of the Act was rejected by the Court because it was obvious in the light of the legislative history that the Act was intended to be applied only as between carrier and cargo and had nothing to do with liability between ships. After reciting the evils which the Harter Act was designed to overcome, the Court said: "The act was an outgrowth of attempts, made in recent years, to limit as far as possible the liability of the vessel and her owners, by inserting in bills of lading stipulations against losses arising from unseaworthiness, bad stowage, and negligence in navigation, and other forms of

liability which had been held by the courts of England, if not of this country, to be valid as contracts and to be respected even when they exempted the ship from the consequences of her own negligence." In that case, too, it is clear that the Court disapproved vigorously of the shipowners' practices which led to the enactment of the Harter Act, and that it did not want the carriers' liability to be "frittered away." So it is not surprising to find the Court saying in The Chattahoochee, supra, 173 U.S. 540, 555, 19 S.Ct. 491, 497: "This is in effect extending the doctrine of the Delaware case, wherein the question of liability for the loss of the cargo was not in issue, to one where the vessel suffering the greater injury is also the carrier of a cargo—in other words, if the Harter act was not intended to increase the liability of one vessel toward the other in a collision case, the relations of the two colliding vessels to each other remain unaffected by this act, notwithstanding one or both of such vessels be laden with a cargo."

█ Similar indications are also to be found in The North Star, supra, 106 U.S. 17, 1 S.Ct. 41, where cargo was not involved, but it was held that where two vessels collided, and both were at fault, the one which was sunken and totally lost could not have limitation of liability until *after* the balance of damages had been struck between the two vessels. Thus the Court's view clearly was that striking the balance of damages between the two vessels was a process independent of other liabilities or the limitation of them. We agree therefore with the recent statement of this court in American Mut. Liability Ins. Co. v. Matthews, supra, 2 Cir., 182 F.2d 322, 324, that "The Harter Act was not intended to affect the liability of one vessel to the other in a collision case."[8] Or as Judge L. Hand said concurring, 182 F.2d at page 326: "Thus, the effect of the doctrine of The Chattahoochee, supra, was that the sum of these changes in the owner's duties was not enough to justify extending the release beyond direct claims of shippers." Since, as Judge Medina pointed out, the Carriage of Goods by Sea Act admittedly was designed to continue the public policy of the Harter Act, except for the modification as to the due diligence prerequisite (Knauth, Ocean Bills of Lading 135, 3d Ed. 1947; Robinson, Admiralty 503 506, 1939), the American policy seems quite clear. It is against the modification sought to be made by the Both-to-Blame clause; the attempt to push the policy of the legislation to a point where it has definitely not gone is in itself legislation.[9]

---

**8.** This appears to have been also the view of distinguished experts; thus see Mr. Charles C. Burlingham testifying for the Brussels Collision Convention, supra note 3, but conceding that "the policy of the United States is shown not only in the Harter Act, but in the interpretations of the Harter Act, and I suppose that the Chattahoochee is a part of the policy of the United States at this moment until it is changed." Hearings on Brussels Collision Convention, 1910, before a Subcommittee of the Committee on Foreign Relations, U. S. Senate, 75th Cong., 2d Sess. 72, Jan. 10–14, 1938.

**9.** The "Both-to-Blame" clause was specifically before Congress in its consideration of this Act. One representative of shippers proposed that it be specifically invalidated by amendment added to § 4(3), 46 U.S.C.A. § 1304(3); but other shippers' representatives thought a specific prohibition unnecessary and were unwilling to jeopardize the main bill by pressing for it. Hearings before Committee on Commerce, U. S. Senate, on S. 1152, A Bill Relating to Carriage of Goods by Sea, 74th Cong., 1st Sess. 51–59, May 10, 1935; Hearings before Committee on Merchant Marine and Fisheries, House of Representatives, on S. 1152, 74th Cong., 2d Sess. 49–53, Jan. 26, 1936. The parties naturally draw diverse interpretations from this history. On the direct point it appears inconclusive, though the absence of any change of general policy in the Act as a whole remains clear.

The parties are also in disagreement as to the meaning of § 4(3) as enacted, 46 U.S.C.A. § 1304(3), reading: "The shipper shall not be responsible for loss. or damage sustained by the carrier or the ship arising or resulting from any cause without the act, fault, or neglect of the shipper, his agents, or his servants." Appellants say that this was specifically directed to the outlawing of any attempts to put responsibility upon the shipper other than as defined by the

There remains the issue whether by other provisions of the statutes in question authorization of special contracts of this nature can be spelled out. In the light of this background it seems clear that such authorization must be clear, for otherwise the old prohibitions against contracts cutting down shippers' rights must still prevail. The question here would seem answered by the parties by their very acts showing that such authorization is not clear, for they draw different conclusions from the same provision of the governing Act. Sec. 3(8) of the Carriage of Goods by Sea Act, 46 U.S.C.A. § 1303(8), provides: "Any clause, covenant, or agreement in a contract of carriage relieving the carrier or the ship from liability for loss or damage to or in connection with the goods, arising from negligence, fault, or failure in the duties and obligations provided in this section, or lessening such liability otherwise than as provided in this chapter or section 25 of Title 49, shall be null and void and of no effect. A benefit of insurance in favor of the carrier, or similar clause, shall be deemed to be a clause relieving the carrier from liability." Here the position of the parties may appear somewhat reversed, cargo claiming that this language reaches the liability here, while the shipowners assert that it does not invalidate agreements concerning liability of a carrier, as it may be assessed in accordance with the principles of the divided damage rule. But at least it is additional evidence that Congress meant to grant the carriers only whatever benefits were explicitly set out in the legislation. It is therefore consistent with our conclusion drawn from the general features of the Act itself.

Both the shipowners and the District Court rely heavily on the decision and principle established in The Jason, supra, 225 U.S. 32, 32 S.Ct. 560. There the principal question was whether a shipowner could enforce a clause in the bill of lading which required cargo owners to contribute to general average for sacrifices and expen-

ditures incurred in a successful effort to save a negligently stranded vessel and her cargo. The issue arose because of the ruling in The Irrawaddy, 171 U.S. 187, 18 S.Ct. 831, 43 L.Ed. 130, to the effect that § 3 of the Harter Act did not by itself change the previous law, Ralli v. Troop, 157 U.S. 386, 15 S.Ct. 657, 39 L.Ed. 742, refusing the shipowner a right to enforce contributions to general average where his own negligent navigation had made the sacrifice necessary. The Jason held that by contract the cargo owner *could* waive the defense available to him under the Irrawaddy rule; i. e., the clause in the bill of lading was upheld, and the cargo owners forced to contribute. So the "Jason clause" has now become a usual part of ocean bills of lading and is recognized in the Carriage of Goods by Sea Act, § 5, 46 U.S.C.A. § 1305, last sentence.

Like all analogies, the persuasiveness of this precedent depends upon its closeness to our case. We do not think it persuasively close; it deals with a situation which—in analysis and in fact—is not to be approached as a restriction of the rights of cargo as our present agreement so clearly is. This is well pointed out by Judge Chase in The Toluma, 2 Cir., 72 F.2d 690, 693, thus: "This Jason clause is not in any real sense a diminution of the rights cargo would otherwise have. On the contrary, it enables cargo to have the master as its agent at the time and place of the peril to act for it to make such sacrifices as may be timely and effective to avoid greater loss. And to secure that right, cargo agrees to contribute in general average though the Harter Act would otherwise excuse it from so doing." And when this decision was affirmed by a unanimous Court in Aktieselskabet Cuzco v. The Sucarseco, supra, 294 U.S. 394, 403, 55 S.Ct. 467, 471, Chief Justice Hughes expressed the same thought when he said that "the effect of the 'Jason clause' is to invest the master with authority and responsibility to act directly for cargo in relation to cargo's duty to

Act itself, while the shipowners say that this applies only to loss or damage caused by cargo and was intended to restate existing law. In the view we take of the

general provisions of the law, we need not attempt to resolve the ambiguity existing as to this specific provision.

380

contribute in general average. The master becomes for that purpose the representative of cargo." And he added: "The 'Jason clause' was sustained because it admitted the shipowner to share in general average only in circumstances where by the Harter Act he was relieved from responsibility." As is obvious, the present Act, too, does not outlaw all contracts between shipper and carrier; it strikes down only those limiting the shipper's rights. Hence the Jason clause escapes the prohibition; the Both-to-Blame clause cannot.

█ We conclude that the Both-to-Blame clause cannot be upheld and the interlocutory decree must be revised to eliminate the provision for indemnity to the United States under it. Reversed. Since the appeal attacked only this portion of the decree, the latter of course stands in all other particulars.

AUGUSTUS N. HAND, Circuit Judge (dissenting).

I dissent on the ground that I regard the "Both-to-Blame" clause valid for the reasons stated by Judge Medina in the court below.