315 F.2d 598
 LUCKENBACH STEAMSHIP COMPANY, Inc., as owner of the S.S.
LENA LUCKENBACH, Libelant-Appellee,
v.
UNITED STATES of America, Respondent-Appellant, The
Ministers of Transport, etc., for the United
Kingdom of Great Britain and Northern
Ireland, etc.,
Intervening-
Petitioners-
Appellants.
UNITED STATES of America, as owner of the S.S. JAMES
FENIMORE COOPER, Cross-Libelant-Appellant,
v.
LUCKENBACH STEAMSHIP COMPANY, Inc., as owner of the S.S.
Lena Luckenbach, Cross-Respondent-Appellee.
 Nos. 215, 216, Dockets 27678, 27679.
 United States Court of Appeals Second Circuit.
 Argued Jan. 22, 1963.
Decided March 22, 1963.
 
 Walter L. Hopkins, New York City (Joseph D. Guilfoyle, Asst. Atty. Gen., Vincent L. Broderick, U.S. Atty., Robert M. Morgenthau, U.S. Atty., Morton S. Hollander, Chief, Appellate Section, Civil Division, Dept. of Justice, Louis E. Greco, Attorney in Charge, New York Office, Admiralty & Shipping Section, Dept. of Justice), for the United States and intervening-petitioners.
 Herbert M. Lord, New York City, Burlingham, Underwood, Barron, Wright & White, New York City, for libelant-cross-respondent-appellee.
 Before FRIENDLY, SMITH and MARSHALL, Circuit Judges.
 FRIENDLY, Circuit Judge.
 
 
 1
 These appeals from a decree in admiralty by Judge Levet in he Southern District of New York relate to a collision twenty years ago, on April 20, 1943, between the Luckenbach vessel Lena Luckenbach and the James Fenimore Cooper, owned and operated by the United States, while the two ships were in convoy on the North Atlantic. The Lena was transporting consumable goods consigned to the British Government under the Lend-Lease (Defense Aid) Act of March 11, 1941, 22 U.S.C., Supp. III, 411-419, and the Master Lend-Lease Agreement between the United States and the United Kingdom signed on February 23, 1942, Executive Agreement Series 241. The bills of lading included a 'Both-to-Blame' clause; this provided, in effect, that if the Lena collided with another vessel, both being to blame, and the Lena's cargo recovered against the non-carrying vessel which in turn recouped a part of this recovery from Luckenbach, the cargo would reimburse Luckenbach for any cargo damage liability thus borne by he latter. The Supreme Court's invalidation of such a clause as an unwarranted extension of the carrier's immunity, under 4(2) of the Carriage of Goods by Sea Act, 46 U.S.C. 1304(2), from direct liability to his own cargo for damages resulting from faulty navigation, United States v. Atlantic Mutual Ins. Co. (Esso Belgium-Nathaniel Bacon), 343 U.S. 236, 72 S.Ct. 666, 96 L.Ed. 907 (1952), post-dated the instant collision by nearly a decade.
 
 
 2
 In July, 1943, Luckenbach filed against the United States under the Suits in Admiralty Act, 46 U.S.C. 742-752, a libel 'as owner of steamship Lena Luckenbach and on behalf of any others interested in said vessel, her use and operation and as bailee of her cargo and in behalf of the master, officers and crew for lost personal effects and personal injuries', claiming that the collision was caused solely by the fault and negligence of the Cooper. The United States denied liability and countered with a crosslibel for damages to the Cooper, claiming the accident to have been due solely to faulty navigation by the Lena. On August 7, 1946, both parties consented to the entry of an interlocutory decree by the District Court. This recited that the parties had agreed that the vessels were equally at fault and decreed that Luckenbach, 'as owner of steamship 'Lena Luckenbach' and on behalf of any others interested in said vessel, her use and operation, and as bailee of her cargo and on behalf of the master, officers and crew for lost personal effects and personal injuries', recover from the United States 'one-half of the damages sustained by it as a result of the collision', and that the United States, as owner of the Cooper, recover half of its damages from Luckenbach, along with appropriate provisions for interest and costs. If the damages could not be agreed, either party might present an order for the appointment of a commissioner.
 
 
 3
 Since negligent operation of the Lena was an excepted cause under 4(2) of the Carriage of Goods by Sea Act, 46 U.S.C. 1304(2), the collision gave rise to no direct claim by the Lena's cargo against Luckenbach as owner of the carrying vessel. As will later be seen, as Agreement between the governments made it impossible for the British Government, quite apart from any question as to the extent of its interest in the Lena's cargo, to derive any financial benefit from asserting, or from having Luckenbach assert on its behalf, a claim for cargo damages against the United States as owner and operator of the Cooper. Neither, so long as the Both-to-Blame clause was considered valid, was there any possibility that the cargo claim could be utilized to impose partial liability on Luckenbach by invoking the rule of The Chattahoochee, 173 U.S. 540, 19 S.Ct. 491, 43 L.Ed. 801 (1899),[1] which permits the non-carrying vessel to recoup from the carrying vessel half of any amount awarded against the former in respect of damage to the cargo-- even assuming for the moment that the inter-governmental agreement and the nature of the cargo permitted such an award to be made in favor of Great Britain against the United States.
 
 
 4
 The validity of the Both-to-Blame clause was challenged in United States v. The Esso Belgium, decided in the Southern District of New York on May 9, 1950, 90 F.Supp. 836. Although the decision there sustained the validity of the clause, this Court reversed sub nom. United States v. Farr Sugar Corp., 2 Cir., 191 F.2d 370 (1951), and the Supreme Court affirmed us sub nom. United States v. Atlantic Mutual Ins. Co., supra. This meant that the cargo was free of any obligation to indemnify the carrying vessel for amounts which the latter was bound under the Chattahoochee doctrine to contrinbute because of the cargo's damage claim against the non-carrying vessel. Meanwhile, in January, 1950, apparently sensing what might be in the wind, the United States Attorney for the Southern District of New York moved for, and was subsequently granted, leave to intervene on behalf of the british Government in Luckenbach's libel and to present its claim agains the United States. The consequences to Luckenbach of a successful assertion of this claim and of recoupment by the United States of one-half of its liability to Great Britain, which is what this litigation is now about, can be appreciated if we move ahead of the story and calculate, on the basis of the subsequently stipulated damage figures, the result (before interest) if the cargo calim is excluded or included:
 
 
 5
 CARGO CLAIM EXCLUDED CARGO CLAIM INCLUDED
Half hull damage Half hull damage
to Lena $100,736.69 to Cooper $ 68,875.17
Less half hull Plus half United
damage to Cooper 68,875.17 States' liability to
 ------------ cargo 175,000.00
 -----------
 $243,875.17
 Less half hull damage
 to Lena 100,736.69
 -----------
 United States'
Luckenbach's recovery recovery from
from United States $ 31,861.52 Luckenbach $143,138.48
 
 
 6
 It is undisputed that if the cargo of the Lena had belonged to a private citizen, the result in the right hand column would be proper-- with the United States also having to pay the cargo another $175,000 as the unrecouped share of the cargo damage. But, as we have explained, this was not the case. The shipment was to the British Government under the Lend-Lease program, and there was an Agreement relating to wartime intergovermental claims. Postponing inquiry into the legal status of the Lend-Lease cargo, we now introduce the Agreement made between the two Governments on December 4, 1942, picturesquely known as the 'Knock-for-Knock' Agreement, Executive Agreement Series 282. After a preamble stating that the governments of the United States and Great Britain were 'desirous of defining, in so far as certain problems of marine transportation and litigation are concerned, the manner in which shall be provided mutual aid in the conduct of the war', Article 1(1) of this Agreement provided:
 
 
 7
 '(1) Each contracting Government agrees to waive all claims arising out of or in connection with negligent navigation or general average in respect of any cargo or freight owned by such Government and in respect of any vessel (including naval vessel) owned by such Government against the other contracting Government or any cargo, freight or vessel (including naval vessel) owned by such other Government or against any servant or agent of such other Government or in any case where such other Government represents that such claim if made would ultimately be borne by such other Government.'
 
 
 8
 However, Article 2 of the Agreement went on to say:
 
 
 9
 'Where in any case claims arise which are not required to be waived by this Agreement in addition to or in conjunction with claims which are so required to be waived and it is necessary in any proceedings including proceedings for the limitation of liability that claims be marshalled or for the proper assessment of any salvage or general average that values should be estimated, the provisions of this Agreement shall not apply but claims which would otherwise be required to be waived under this Agreement shall be asserted. Any recoveries, however, shall be waived by the Government entitled to such recoveries or at the option of such Government shall be dealt with in such other way as will give effect to the purposes of this Agreement.'
 
 
 10
 The libels here slumbered in the District Court while the litigation over the validity of the Both-to-Blame clause was wneding its way to the Supreme Court, and for some years thereafter. In March, 1955, the damage issues were referred to Leslie H. Arps, Esq., as Special Commissioner, and a further order enlarging the scope of his authority to include the issues raised by the petition to intervene on behalf of the British was made in April, 1957. Ultimately, he rendered a report concluding that any claim by the British against the United States for damage to the cargo was waived by Article 1 of the Knock-for-Knock Agreement, and that Article 2 was inapplicable because this was not a case in which 'claims arise which are not required to be waived by this Agreement.' Accordingly he recommended that Luckenbach be awarded $31,861.52 against the United States, and that the intervening petition be dismissed. Judge Levet confirmed this conclusion on two alternative grounds: (1) that the petition for intervention presented no justiciable 'case or controversy' within the grant of jucicial power in Article III of the Constitution, because the United States had no interest in resisting the British claim against it but rather was promoting that claim and doing so through its own attorney, and (2) that any British claim against the United States was waived by the Knock-for-Knock Agreement, as the Commissioner had found.
 
 
 11
 Strick logic might dictate that we first pass upon the judge's ruling under Article III, since this goes to 'jurisdiction'. In a realistic sense, however, the determination of the existence of a 'case or controversy' cannot be made solely by considering the identity and interests of the parties but requires also an inquiry into their legal relationship and the nature of the claim being asserted; the constitutional limitation cannot sensibly be read as withdrawing from federal courts the power to make a determination thus pertinent to deciding whether a case or controversy exists, or as preventing them, once such an inquiry shows the absence of a tenable claim, from dismissing the case on that ground without passing upon a constitutional question no longer necessary to determine.
 
 
 12
 Again treating the cargo as 'owned' by the British Government, the claim raised by the intervening petition clearly came within Article 1 of the Knock-for-Knock Agreement; therefore it could not be asserted unless this was permitted by Article 2. The crucial words are 'Where in any case claims arise which are not required to be waived by this Agreement in addition to or in connection with claims which are so required to be waived and it is necessary in any proceedings including proceedings for the limitation of liability that claims be marshalled * * *.' Luckenbach contends that claims 'which are not required to be waived by this Agreement' are only claims 'against the other contracting Government', not claims against private citizens like itself which 'the other contracting Government' would have only if a claim against it which was required to be waived had been successfully asserted; Luckenbach also questions whether this is a procedure where 'it is necessary * * * that claims be marshalled * * *.' The United States responds that but for the Knock-for-Knock Agreement the United Kingdom would have had a claim against the United States and the United States a claim for recoupment against Luckenbach; that although the former was 'required to be waived', the latter was a claim 'not required to be waived * * * in addition to or in conjunction with' the claim required to be waived; and that therefore the claim 'which would otherwise be required to be waived * * * shall be asserted,' although any recoveries by the British were to be waived or 'dealt with in such other way as will give effect to the purposes of this Agreement.' The United States also contends that 'marshalled' was used not in its limited technical sense but as broadly including the assertion of claims and cross-claims characteristic of the admiralty.
 
 
 13
 The only case cited to us construing this language is Petition of Panama Transport Co., 172 F.2d 351 (2 Cir., 1949), arising under a similarly worded Knock-for-Knock Agreement with Norway. A collision between the privately-owned Clio and the United States-owned Spring Hill had caused damages to the two ships, deaths and personal injuries aboard the Spring Hill, and damage to and deaths and personal injuries aboard the Vivi, a Norwegian tanker anchored nearby. The District Court held the Clio solely at fault, and the Norwegian Government, acting both as owner of the Vivi and as subrogee of certain personal injury and property claims of her crewmen, filed claims in the Clio's limitation-of-liability proceeding. Although the Clio was privately owned, she was, as the District Judge found, under time charter to the United States acting through the War shipping Administration; as appears from the record, that agency was acting in effect as a liability insurer for the Clio and the United States had accordingly made the representation, referred to in the final clause of Article 1(1) of the Knock-for-Knock Agreement, that the Norwegian Government's claim would ultimately be borne by it. Hence it was argued that Article I precluded the Norwegian Government from obtaining any decree against the Clio. This Court affirmed a judgment permitting the Norwegian Government to assert in the Clio's limitation proceeding its waived claim for damage to the Vivi, although no recovery could be had thereon-- the effect of this presumably being to reduce recovery on the other claims and, consequently, to disminish the liability of the War Shipping Administration under its insurance of the Clio.
 
 
 14
 Luckenbach would distinguish the Panama Transport case on the basis that it involved, not claims by a government against a private party, but claims (those on behalf of the Vivi's crewmen) against the United States. The United States, in reply, says this interpretation would produce the allegedly absurd result that the assertability of large claims of allied governments against the United States for loss or damage to cargoes carried in private vessels and of cross-claims by the United States against the carrying vessels would depend on the fortuitous co-existence of other claims, perhaps paltry in amount, for injury to members of the crew of the carrying vessel or even to their belongings. But there is no absurdity in saying that a foreign government's cargo claim against the United States may be asserted only when there are other claims against the United States that may be affected by such assertion, however small these may be; in order to make out its claim of absurdity the Government must take the further step that assertion of the waived cargo claim by the foreign government would entitle the United States not merely to 'assert' but to maintain a claim against the private shipowner for exoneration or indemnity with respect to a liability it will never have to bear. We are by no means convinced of this last proposition; The Chattahoochee and the other Supreme Court cases cited above with respect to recoupment by the non-carrying ship speak in terms of amounts paid or payable to the cargo of the carrying ship. See The Gulf Stream, 64 F. 809 (2 Cir., 1894).
 
 
 15
 We find it unnecessary to decide as between these and other contentions as to the Knock-for-Knock Agreement or, in that connection, to pass on the Government's claim that certain evidence allegedly favoring its construction was wrongly excluded. For, in our view, the character of the shipment on the Lena was such that no claim by the British Government against the United States could ever arise.
 
 
 16
 It is not disputed that if the Lena's cargo had been ordinary United States Government property, such as supplies for the army, no intervening petition for the cargo could have been filed since the Government, no more than any other person, can sue itself. We have held this to be so even if, because of insurance, a determination of the claim would in fact have had economic consequences. Defense Supplies Corp. v. United States Lines Co., 148 F.2d 311 (2 Cir., 1945), contrast United States v. I.C.C., 337 U.S. 426, 69 S.Ct. 1410, 93 L.Ed. 1451 (1949). The question here is whether the United States had conferred such rights on the British Government with respect to the cargo on the Lena as to call for a different result.
 
 
 17
 Although 3(a)(2) of the Lend-Lease Act, 55 Stat. 31 (1941), permitted transfer of title, the Special Commissioner found that 'title to the cargo (shipped on the Lena) * * * remained in the United States and did not pass to the United Kingdom.' In accordance with an express requirement made in 4 of the Lend-Lease Act, Article III of the Master Lend-Lease Agreement with Great Britain provided that:
 
 
 18
 'The Government of the United Kingdom will not without the consent of the President of the United States of America transfer title to, or possession of, any defense article * * * transferred to it under the Act * * *.'
 
 And Article V provided:
 
 19
 'The Government of the United Kingdom will return to the United States of America at the end of the present emergency, as determined by the President of the United States of America; such defense articles transferred under this Agreement as shall not have been destroyed, lost, or consumed and as shall be determined by the President to be useful in the defense of the United States of America or of the Western Hemisphere or to be otherwise of use to the United States of America.'
 
 
 20
 That, however, is not conclusive; the Commissioner found, and it is not disputed, that despite Article III, the United Kingdom was authorized to sell consumable commodities delivered to it under the Lend-Lease program, such as those on board the Lena, to individuals in the United Kingdom for private sale to the consuming public. He found also that when the Lena's cargo was delivered ship-side at the American port, a representative of the United Kingdom, in accordance with general practice, acknowledged receipt of delivery of the commodities, and the Lend-Lease Administration then entered on its books a 'charge' against the United Kingdom for the cost of the commodities plus the freight. But the Master Lend-Lease Agreement imposed no obligation ever to pay this 'charge', and any claim by the United States for such payment was later waived by paragraph 6 of the Agreement on Settlement of Intergovernmental Claims signed March 27, 1946, Treaties and Other International Act Series 1509, p. 15, and paragraph 7 of the Agreement of Jury 12, 1948, 27th Report to Congress on Lend-Lease Operations, App. II, p. 63.[2] If we were to characterize in conventional terms the legal position of the British Government with respect to the goods, we should say that it was a bailee without responsibility for loss of or damage to the goods and with the right to use or consume them or to transfer title to certain other persons for purposes of consumption.
 
 
 21
 We can readily agree that this status sufficed to give the United Kingdom a claim against third persons for the full damage caused by tortiously injuring or destroying Lend-Lease goods; even a bailee without the extensive added privileges we have enumerated can enforce such a claim. The Winkfield, L.R. (1902) 42; Brown, Personal Property (2d ed. 1955), 390. But the bailee cannot recover the full amount of the loss or damage when it is caused by the bailor; all he can recover in such a case is any interest he holds independently of and in opposition to the bailor. Brown, supra, at 393-95. It would thus be most unlikely that a bailee could recover anything against the bailor in the case of a gratuitous bailment; strong evidence would be needed to warrant a conclusion that the bailor meant not only to give the bailee the free use of the article but such an interest as would subject himself to a claim by the bailee if he negligently damaged or destroyed it.
 
 
 22
 If ordinary legal principles would thus preclude any claim by the United Kingdom against the United States for negligent damage to the Lena's cargo, this is a fortiori true when consideration is given to the nature and objects of the Lend-Lease program. The program had its origin in President Roosevelt's characteristically vivid and homely statement at his press conference on December 17, 1940:
 
 
 23
 'Now, what I am trying to do is eliminate the dollar sign. That is something brand new in the thoughts of everybody in this room, I think-- get rid of the silly, foolish, old dollar sign.
 
 
 24
 'Well, let me give you an illustration. Suppose my neighbor's house catches fire, and I have a length of garden hose four or five hundred feet away. If he can take my garden hose and connect it up with his hydrant, I may help him to put out the fire.
 
 
 25
 'Now, what do I do? I don't say to him before that operation, 'NEIGHBOR, MY GARDEN HOSE COST ME $15; you have to pay me $15 for it.'
 
 
 26
 'What is the transaction that goes on? I don't want $15-- I want my garden hose back after the fire is over * * *.'[3]
 
 
 27
 The Lend-Lease Act of March 11, 1941, was enacted in that spirit. It would be difficult to think of anything more contrary to President Roosevelt's concept than that the neighbor should be able to sue the lender of the garden hose for negligently damaging it in the course of delivery, or that the 'silly, foolish, old dollar sign' was being removed so far as concerned payment by the borrower only to return in the guise of a damage claim by the borrower against the lender. The former general counsel of the Lend-Lease Administration testified that he had never heard of any such claim being asserted by a recipient country, and that if one had been, he would have taken the position that it should be withdrawn. Bearing in mind the principle behind the Lend-Lease Act and the practical reality, to quote the general counsel, that 'the recipient countries knew as a matter of policy and as a matter of politics we were going up to get additional appropriations at least once a year, and sometimes more often than that,' it is quite unthinkable that any country receiving Lend-Lease aid ever supposed it could assert a claim for negligent damage by the United States to goods made available by this country for which the receiving government had not paid and was not expected to pay, although it was expected to and did furnish 'reverse lend-lease' to the extent of its ability. What the situation would be with respect to goods that were in the Lend-Lease 'pipeline' at the termination of hostilities, for which a financial settlement was made, we need not consider.[4]
 
 
 28
 The intervening petition should therefore have been dismissed on the ground that the United Kingdom had no claim against the United States for negligent damage to the Lend-Lease cargo on the Lena Luckenbach. We affirm the judgment on that basis, without passing on the grounds relied on by the District Judge or on other contentions made before us.
 
 
 29
 Affirmed.
 
 
 
 [1]
 See also Erie R. R. Co. v. Erie & Western Transportation Co., 204 U.S. 220, 27 S.Ct. 246, 51 L.Ed. 450 (1907), and Aktieselskabet Cuzco v. The Sucarseco, 294 U.S. 394, 55 S.Ct. 467, 79 L.Ed. 942 (1935)
 
 
 [2]
 The Commissioner found that from the time of receipt at ship-side, 'the risk of loss and damage was borne by the United Kingdom,' which 'was also responsible for any general average charges which might arise against the cargo while en route.' We construe the first of these findings to mean only that, as testified by Oscar Cox, Esq., the former general counsel of the Lend-Lease Administration, and Professor Michael Cardozo, who had served on his staff, no change would be made in the accounts if the loss occurred after receipt; how different the situation was from the usual one where risk of loss passes to a consignee is shown by Professor Cardozo's testimony that when the United States found that receiving governments had insured Lend-Lease cargo, it requested that this practice be discontinued and that any insurance proceeds collected be remitted to the United States
 
 
 [3]
 Sherwood, Roosevelt and Hopkins, 225; Stettinius, Lend-Lease, Weapon for Victory, 1
 
 
 [4]
 In order to make it crystal-clear that the United Kingdom took no action in this proceeding contrary to what we regard as the spirit of the Lend-Lease Agreement, we emphasize that its claim against the United States was asserted at the instance of the United States and through the United States Attorney